UNITED STATES, Appellee

v.

WILLARD F. GREENWOOD, Corporal, U. S. Army, Appellant

6 USCMA 209, 19 CMR 335

No. 6156
Decided August 5, 1955

*Captain Frank C. Stetson* argued the cause for Appellant, Accused. With him on the brief was *Lieutenant Colonel Joseph L. Chalk.*

*First Lieutenant A. Kenneth Pye* argued the cause for Appellee, United States. With him on the brief were *Lieutenant Colonel Thomas J. Newton* and *Major Stanley H. Rubinowitz.*

## Opinion of the Court

PAUL W. BROSMAN, Judge:

The accused in this case stands convicted of having wrongfully used a narcotic drug. A general court-martial convened at Kobe, Japan, found him guilty of this offense, in violation of Article 134, Uniform Code of Military Justice, 50 USC § 728, and sentenced him to be dishonorably discharged from the service, as well as to total forfeitures and confinement at hard labor for two years. Intermediate appellate authorities have affirmed both the findings and sentence, and we granted the accused's petition for review for the purpose of determining whether certain instructions given by the law officer at the trial constituted prejudicial error.

II

During the fore part of July 1954, the accused requested of a Japanese female acquaintance that she obtain for him some "stuff"—understood by her to mean narcotics. Thereafter, on July 13 the former was apprehended by Army criminal investigators, to whom he submitted a urine specimen voluntarily. A chemical analysis of this specimen revealed the clear presence of morphine.

Testifying on the accused's behalf, Miss Hatsue Oyama, a rather unwholesome Japanese girl with overt matrimonial intentions, related that on July 11, and again on the following day, she had quarreled violently with Greenwood over his refusal to marry her. Scorned by her chosen vessel, her fury took the form of a white "suicide powder"—a substance calculated, even guaranteed, to cause considerable pain —which she surreptitiously placed in two cigarets and in a bottle containing beer. The accused—somewhat intoxicated at the time—consumed these items and appeared to give no indication that he had detected the presence of the foreign matter. However, Miss Oyama did not profess to know whether the powder did or did not contain a narcotic drug.

Although the accused elected to remain silent at the trial, several witnesses—including his commanding officer—testified that his reputation for truthfulness was good, and that he was not regarded as a user of narcotics.

Before the members of the court-martial retired to consider their findings, the law officer instructed them, *inter alia,* that if the accused honestly *and reasonably* labored under the mistaken belief that the beer and cigarets used by him on July 13 were not contaminated by a narcotic, he was entitled to acquittal. Shortly after the instruction was given, the court-martial returned findings of guilty. We are now called on to assess the correctness of this instruction.

III

It must be said at the outset that our decision in the present case will be controlled largely by our pronouncements in United States v. Hughes, 5 USCMA 374, 17 CMR 374; and United States v. Reese, 5 USCMA 560, 18 CMR 184. In those two cases we held that the giving of an instruction to the effect that knowledge on the part of an accused of the physical presence of a narcotic—where that issue is reasonably raised by evidence—is a prerequisite to valid findings of guilty of the wrongful *possession* of a habit-forming drug. Further, in the Hughes case, supra, we commented on the dichotomy between knowledge of the *contraband character* of the object possessed, on the one hand, and knowledge of its *presence* within the control of the possessor, on the other—and concluded that knowledge of the former type was immaterial, but that consciousness of the physical presence of the drug in-

**211**

volved there was a necessary concomitant of its wrongful possession.

Purporting to recognize these principles, Government counsel suggest that, since knowledge of the nature of the object is of no essential importance in wrongful *possession* cases, it is likewise immaterial to a determination that an accused wrongfully *used* a narcotic. We are then told that in wrongful use cases, quite unlike those involving possession, an awareness of the presence of the commodity consumed will seldom, if indeed ever, become an issue—this for the reason that one who takes a substance into his body is necessarily aware that he is doing so, although he may not realize the nature of the matter consumed. Since the accused here must have known that he had smoked the tainted cigarets and drunk the poisoned beer—the argument concludes—he is not entitled to an instruction related to a want of knowledge that tobacco smoke and an alcoholic beverage, both allegedly containing foreign matter, had entered his body.

Since this argument completely misinterprets our decision in United States v. Hughes, supra, it is apparent that confusion has arisen respecting our prior expressions in this area. Pretermitting for the moment an attempt to resolve the specific issue with which we are confronted in the case at bar, we think it advisable—even essential—to set out at length our views on the issue of knowledge in relation to the crimes of wrongful use and wrongful possession of narcotic drugs.

## IV

The initial and basic difficulty encountered in the present effort derives from the paucity of information from which to begin an analysis. Nowhere does the Uniform Code proscribe either the use or the possession of narcotics—for these acts are made punishable only insofar as they constitute conduct to the prejudice of good order and discipline, or of a nature to bring discredit on the Armed Forces, in violation of Article 134. The language of paragraph 213a of the Manual for Courts-Martial, United States, 1951—

212

although more helpful—is nonetheless scanty:

"It is a violation of this article *wrongfully to possess marihuana or a habit forming narcotic drug.* Possession of marihuana or of a habit forming narcotic drug is presumed to be wrongful unless the contrary appears. A person's possession of a drug is innocent when the drug has been duly prescribed for him by a physician and the prescription has not been obtained by fraud, or when his possession is the result of accident or mistake, or when he possesses it in the performance of his duty."

We see at the outset that the term "knowledge" is not mentioned in the quoted paragraph—nor are any of its synonyms. Moreover, nothing at all is said with respect to the wrongful *use* of such drugs. We do find, however, that model specifications covering both offenses are included in the Manual—and that conviction of either may subject the perpetrator to a punishment running to dishonorable discharge, total forfeitures, and confinement at hard labor for five years. Manual, supra, pages 225, 490. For the purposes of initial discussion, therefore, it will be necessary to rely entirely upon the language of the Manual dealing with wrongful possession.

The rule found there—which announces that the possession of a narcotic drug is presumed to be wrongful unless the contrary appears—is based on a provision found in 21 USC § 174, which denounces the fraudulent or knowing importation of narcotic drugs into the United States. See Legal and Legislative Basis, Manual for Courts-Martial, United States, 1951, page 294. The pertinent portion of the Federal act provides that:

"Whenever on trial for a violation of this section the defendant is shown to have or to have had possession of the narcotic drug, such possession shall be deemed sufficient evidence to authorize conviction unless the defendant explains the pos-

session to the satisfaction of the jury."

However, this importation act is worded in terms of conscious conduct, with the result that the accused may defend on the ground of a lack of knowledge. See United States v. Feinberg, 123 F2d 425 (CA 7th Cir); Pon Wing Quong v. United States, 111 F 2d 751 (CA 9th Cir). What the quoted section of the act appears to contemplate, as indicated by the Federal authorities cited above, is the placement of some sort of burden on the defendant to establish a lack of knowledge—thus absolving the Government from the difficult task of proving this element by extrinsic evidence.[1] Similarly we think, the framers of the Manual sought to enunciate a rule which would require one accused of the wrongful possession of drugs to present facts sufficient to raise a defense for submission to the court-martial.

Moreover, the Manual provision under scrutiny specifically enumerates three types of defenses. One who possesses a drug pursuant to a valid prescription, or who obtains a narcotic in the performance of duty, is of course relieved of criminal responsibility, regardless of the existence of knowledge of any sort. But if possession is to be deemed innocent when the result of accident or mistake—as the Manual undeniably says it is—then an issue of knowledge most certainly enters the picture. This latter thought will be developed in greater detail hereafter, but for the moment it is sufficient to suggest that the foregoing reasoning leads inevitably to the conclusion that the element of scienter is not eliminated from the crime of wrongful possession of a narcotic drug simply because it received no explicit mention in the Manual section relating to the offense.

In spite of this observation—to which we have referred repeatedly by implication in other decisions—we continue to hear argument to the effect that the public policy, which demands that military people receive a full measure of protection from the very real horrors of drug addiction, compels the result that a want of knowledge is immaterial in the determination of guilt or innocence of wrongful possession or use. Inevitably, the proponents of this view cite as authority the case of United States v. Balint, 258 US 250, 66 L ed 604, 42 S Ct 301, which concerned a charge of unlawful sale of narcotics contrary to the provisions of the Narcotics Act. That statute provides, in part, that it shall be unlawful for any person to sell any of the drugs enumerated therein, save in pursuance of a written order from the person to whom the article is sold. See 26 USC § 2554. In holding that scienter is not an element of the offense denounced there, the Supreme Court concluded that the evil of exposing innocent purchasers to the dangers of drug addiction easily outweighed the possible injustice arising from the subjection of an innocent seller to a criminal penalty. In a subsequent Federal case, however, where the defendant was charged with a purchase of drugs not in or from the original stamped package, the Court of Appeals, Eighth Circuit, rejected the doctrine announced in the Balint case. In limiting the prior case, the Court of Appeals observed that:

"Many reasons may be assigned why the seller of narcotic drugs engaged in the wholesale or retail drug business and skilled in the knowledge of drugs should be required to de-

---

[1] It should be apparent that the Federal act, in placing the burden of explaining "possession" on the defendant, did not purport to deal with the defense of ignorance of the physical presence of a drug, as exemplified in United States v. Hughes. Rather, 21 USC § 174 contemplates the situation in which a defendant is trapped with narcotics within his control, and is unable to account for their presence. See Pitta v. United States, 164 F 2d 601 (CA 9th Cir). A defense claim of lack of knowledge within the purview of the Federal act, then, would equate either to an ignorance of the physical composition of the substance discovered— as we will discuss in subsequent paragraphs of this opinion—or to an unawareness that the narcotic in question was unlawfully imported.

**213**

termine at his peril whether an article which he sells is a narcotic drug, in order to afford protection to the purchaser, who would not have the same skill and ability to determine the character of the article. On the other hand, it would be wholly unreasonable to require an innocent purchaser, not specially skilled in detecting counterfeit stamps, and in many instances with no opportunity to examine the articles before the purchase was consummated, to buy such narcotic drugs at his peril.

. . . . .

"We are of the opinion that scienter is a necessary element of the offense making it unlawful to purchase narcotic drugs except from or in the original stamped package." [Nigro v. United States, 4 F 2d 781, 785.]

Significantly, this result was reached although the pertinent statute—unlike the act proscribing the knowing importation of narcotics—contains no reference to the term "knowledge." See 26 USC § 2553(a).[2] Obviously, then, the strict rule laid down in United States v. Balint, supra, was intended to apply—and quite properly should apply—only to those who *dispense* drugs to the public. See Morissette v. United States, 342 US 246, 96 L ed 288, 72 S Ct 240. Therefore, we reject—emphatically and finally—the view that these policy considerations, which support the decision in Balint, must be deemed to apply as well to a determination of whether lack of knowledge is available as a defense to one accused of wrongfully using or possessing a narcotic drug.

V

We turn now to an examination of the specific sorts of knowledge—or want thereof—which may or may not become issues in wrongful possession or use cases. In our Hughes opinion, we quoted extensively from the case of People v. Gory, 28 Cal 2d 450, 170 P 2d 433, in which the California Supreme Court elaborated the distinction between (1) a knowledge of the character of the object *and* the unlawfulness of possession thereof, on the one hand, and (2) on the other, a knowledge of the presence of the object such as is embraced within that contempt of "physical control with the intent to exercise such control," which constitutes "possession." Because the language of People v. Gory appears to have been misconstrued, we must seek to clarify the meaning of the two classifications mentioned there.

The first type of knowledge enumerated above refers—we are sure—to no more than the defense █ of ignorance of law. The California court's use of the conjunctive for the purpose of relating the phrases "character of the object" and "unlawfulness of possession" clearly indicates this result. Moreover, the court further referred to this type of cognition as "knowledge of the character of the object as *being a prohibited poison*," and "knowledge of the *contraband* character of the property." People v. Gory, supra, pages 435, 436. (Emphasis supplied.) Thus, if *X* knew that he possessed or used cocaine, but defended on the ground that he was unaware that this drug was included among those proscribed as habit-forming, his contention comes to no more than a claim of ignorance of law—which, of course, constitutes no excuse for a criminal act. Manual, supra, page 295. The California Supreme Court was, therefore, wholly correct in the Gory case in concluding that knowledge of the *unlawful* character of a narcotic is immaterial. We expressly adopted

---

[2] "It shall be unlawful for any person to purchase, sell, dispense, or distribute any of the drugs mentioned in section 2550(a) except in the original stamped package or from the original stamped package; and the absence of appropriate tax-paid stamps from any of the aforesaid drugs shall be prima facie evidence of a violation of this subsection by the person in whose possession same may be found; and the possession of any original stamped package containing any of the aforesaid drugs by any person who has not registered and paid special taxes as required by sections 3221 and 3220 shall be prima facie evidence of liability to such special tax."

214

the language of that decision in United States v. Hughes, supra, and our reasoning there—insofar as the defense of ignorance of law is concerned—applies unqualifiedly to both use and possession situations.

We are equally certain that the second category of knowledge adverted to in the Gory case—that ▮ is, an awareness of the very presence of the substance in question—*will* become a material issue where the defense of lack of this variety of knowledge is reasonably raised by the evidence. Otherwise, an accused might well be convicted of failing negligently to discover that a third party had secretly placed a packet containing narcotics on his person. See United States v. Hughes, supra; United States v. Reese, supra. In order to prevent this result, we iterate once more our previous holding that the presumption of wrongfulness flowing from the possession of a contraband drug does not operate to deprive an accused of the defense of lack of knowledge of the physical presence thereof. Moreover, we refuse to accept all artificial distinctions which may be offered in an attempt to limit this defense to the wrongful possession situation. In short, the defense of want of knowledge of the physical presence of a habit-forming drug is as available to persons accused of wrongful use as it is to others charged with wrongful possession. Thus, we cannot accept the Government's argument in the instant case.

What appellate Government counsel seem to overlook here is the possibility that an accused person may consciously have partaken of a consumable thing, believing it to constitute a particular substance, whereas in fact, but without his knowledge, it contains an *additional* element. By way of illustration, let us assume that X holds in his hand a glass known by him to contain wine. Quite without his cognition Y drops into it a small amount of morphine. If, at that moment, the glass were removed from X's hand, its contents analyzed, and he charged with the wrongful possession of a narcotic, X would doubtless be entitled to an instruction having to do with his want of knowledge that the drug was within his physical control. United States v. Hughes, supra. According to the Government's position, however, if X had drained the glass, unaware as ever that the wine contained an additional ingredient, but a subsequent chemical analysis had disclosed the presence of morphine in his urine, no such instruction would be required. Such a result appears to us to be inconsistent with logic, and as well with the principles enunciated in the previous decisions of this Court. We hold, therefore, that the present conviction, based on the wrongful use of a habit-forming drug, cannot be sustained, if the court-martial could reasonably have found—under correct instructions—that the accused was genuinely unconscious of the physical presence of foreign matter in the cigarets he smoked and the beer he drank.

Before continuing discussion of the issue before us—involving as it does knowledge of the second type—we must advert to a ▮ third possible sort of knowledge which may insinuate itself into a narcotics case. This we may call knowledge of the physical *composition* of the substance possessed or used. For example, let us assume that A is entrusted with a glass phial by a friend and asked to deliver it to a named address. A observes that the bottle contains a white powder, but is otherwise unaware of the nature of the contents. Apprehended with powder—later found to be a narcotic drug—in his possession, is not A entitled to offer as a defense his lack of knowledge of the identity of the article? Certainly, he could have done so had he been unaware of the presence of the drug.

Or suppose that B drinks a cup of coffee into which—with his knowledge—a white crystalline substance has been stirred. Subsequent urinalysis discloses a quantity of a narcotic drug in the accused's body, and the white crystals are later identified as cocaine. In such a situation can we say with impunity that B is foreclosed from offering his lack of knowledge of the composition of the foreign matter introduced into ·the coffee? We think

**215**

not—this under no more than a slight extension of the preceding illustration involving wine, and concluding that, if the liquid is recognized by the consumer, but contains a narcotic secretly placed therein, his lack of knowledge may be urged. In both wrongful use and wrongful possession cases, therefore, this want of knowledge may take the form of an unawareness of the physical composition of the commodity, and where that issue is raised, appropriate instructions are required.

One further ramification of the problem may be noted. The third variety of knowledge, as set forth ■ above may also arise by way of *mistake* as well as through ignorance. For example, we may suppose that A honestly believed that the white powder he was asked to deliver was talcum, whereas it was in fact heroin—or that B drained a glass of a dilute morphine solution under the mistaken impression that the container carried gin. In both instances, had the facts been as each believed them to be, no criminal act would have been committed. We are sure, then, that the defense of mistake of fact, where properly raised, is available to one accused of either the use or the possession of a narcotic drug.

It follows from what has been said that—once the issue of knowledge has been reasonably raised by ■ evidence—a valid conviction of either the wrongful possession or use of a drug must be based on no less respectively than a known physical control over, or physical assimilation of, a substance proscribed by law as a narcotic, the physical composition or character—the identity—of which is also known. A want of this requisite knowledge may arise, of course, as much by reason of what is, strictly speaking, an ignorance of fact as from the presence of a mistake of the same nature on the part of the accused. And an honest want of knowledge—wholly apart from its reasonableness—is sufficient for the accused to make out his defense as a matter of law. Thus—assuming again that the issue has been raised—the accused is entitled to an instruction *sua*

**216**

*sponte* predicating his criminal responsibility on the absence of an honest—not an honest *and reasonable*—ignorance or mistake of fact. To put the matter in another fashion, although ignorance *of law* is irrelevant in this setting, and constitutes no bar to conviction, honest ignorance or mistake *of fact* are distinctly material—both as to the issues of physical control over and physical character of the substance possessed or used.

It is recognized of course—and particularly within the area of knowledge of physical composition or ■ identity—that the circumstances of cases will vary widely. Thus, from a moral standpoint, one who assumes to transport a quantity of uncharacterized white crystals from a known narcotics vender to a known drug addict may be distinguished sharply from one who performs the same kindly errand between unsuspected and reputable persons. Yet we must reject the notion that the reasonableness of the messenger's protested ignorance is relevant, *as such,* to a determination of his criminality. We cannot agree that one may be "charged with notice," and thereafter subjected to criminal liability because he neglects to investigate. Unless required by statute or ancient custom, we simply hesitate to bottom criminal responsibility as a matter of law on a mere negligent omission. And so—once the accused's knowledge has been challenged—penal discrimination between the myriad of possible fact situations must, and safely may, be effected through use of the touchstone of honesty, rather than that of honesty plus reasonableness. We are sure that the conclusion we have reached is preferable, both philosophically and administratively, to any alternative, and are equally certain that it places no undue burden on the Government in narcotics cases. Properly instructed, courts-martial may be counted on—here as elsewhere—to see that short shrift is made of fabricated claims of ignorance or mistake.

Since it is obvious that a possible want of knowledge of the presence of a drug was involved in the case at bar,

we must now inquire whether the law officer's instructions with respect to *mistake* of fact furnished the members of the court with adequate legal guideposts to direct their deliberations with respect to what, after all, is essentially an *ignorance* problem. In United States v. Lampkins, 4 USCMA 31, 15 CMR 31, a case involving a charge of wrongful possession of marihuana, we struck down as erroneous an instruction to the effect that ignorance of fact, or circumstances indicating carelessness on the part of the accused, did not constitute a valid defense. As we pointed out in that case, such an instruction permitted a finding that the accused was guilty of the crime charged, if a reasonable person would have determined that the drug was in his possession.

These principles we deem applicable with equal force to the instruction found in the case before us. By informing the members of the court that the accused was not entitled to the defense of lack of knowledge, unless he honestly *and reasonably* labored under the mistaken belief that the beer and cigarets he consumed were untainted, the law officer misled the finders of fact. In effect, this instruction permitted the court-martial to convict the accused of having wrongfully used a habit-forming drug on the basis of a finding that he was negligent in failing to discover the presence of an additional substance in the articles he used. Thus, if the defense of want of knowledge was reasonably raised, and if the accused honestly—albeit carelessly—was unconscious of the presence of the drug, the members of the court were nevertheless required by the instruction given to return findings of guilty. By reason of what we have said in foregoing paragraphs, therefore, we must hold that the law officer erred in thus presenting the issue of knowledge to the court-martial. Of course, the circumstance that the law officer spoke in terms of mistake, rather than those of ignorance, cannot have harmed the accused.

We now turn to the question of whether an issue of lack of knowledge was raised reasonably by the evidence—for if this was the situation, then the instructional defect prejudiced the accused and demands reversal. United States v. Lampkins, supra. The sole evidence offered by the defense consisted of Miss Oyama's testimony to the effect that she had placed a powder of an undisclosed nature in Greenwood's beer and cigarets. The record reveals literally nothing which would indicate that this powder either constituted or contained a narcotic drug. In fact, Miss Oyama admitted under cross-examination that at no time had she ascertained its composition. Only by the sheerest speculation, therefore, can it be said that the morphine compound discovered in the accused's urine specimen was, in fact, the residue of the substance secretly foisted on him.

Moreover, although we were to assume that this foreign matter was, or included, a narcotic drug, we can find no trace of evidence which would tend to support a claim that the accused *honestly* lacked knowledge of its presence. Since honest ignorance is a matter within the exclusive confines of the accused's mental processes, his reliance on the right to remain silent leaves nothing from which the court-martial could reasonably infer a want of knowledge. Again, in the absence of some substantial evidence supporting this theory of defense, a conclusion that the accused did not know of the presence of the narcotic would rise no higher than conjecture.

Finally, we observe that Miss Oyama had lived with the accused in what is commonly called sin for approximately a year, had received financial support from him, and had expressed an urgent desire to assist him when she learned of his current difficulty. Although, as recounted and demonstrated by her on direct and cross-examination, the story concerning the lovers' quarrel—which resulted in the addition of a wholly undescribed and allegedly pain-producing powder to the accused's refreshments—is highly dubious, we suppose it cannot be said to be unbelievable as a matter of law. Cf. United States v. Grier, 6

USCMA 218, 19 CMR 344. However, it is hardly sufficient of itself to raise the issue of want of knowledge on his part. We hold, therefore, that the error committed by the law officer cannot have operated to the prejudice of the accused.

Thus, the decision of the board of review must be and is affirmed.

Chief Judge QUINN and Judge LATIMER concur.